UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANNY ALLEN WING,

                Petitioner,

    v.

RONALD HAYNES,

                Respondent.

CASE NO. 3:18-cv-05065-RBL-DWC

REPORT AND RECOMMENDATION

Noting Date: July 13, 2018

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Danny Allen Wing, proceeding *pro se* and *in forma pauperis*, filed his federal habeas Petition pursuant to 28 U.S.C. § 2254, seeking relief from his incarceration pursuant to two state court convictions. Dkt. 1. As set forth in a Proffer Agreement (plea agreement), Petitioner was required to provide the State with truthful information and, if he failed two polygraphs, the State retained the right to refile two aggravators it had dropped as part of the Proffer Agreement. Petitioner now argues he is being held unlawfully because the Proffer Agreement uses the term "enhancement," but the State refiled aggravators, rather than enhancements, when Petitioner failed the two polygraphs tests. However, the record affirms the

parties intended to allow the State to refile the aggravators, rather than sentencing enhancements, and the state court of appeals adjudication coming to that same conclusion was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied.

## BACKGROUND

### I. Factual Background

Petitioner was convicted in Lewis County Superior Court ("superior court") of manslaughter in the first degree (domestic violence) and assault of a child in the third degree (domestic violence), both with abuse of trust and particularly vulnerable victim aggravators. Dkt. 12, Ex. 1. The Court of Appeals of the State of Washington ("state court of appeals") stated the facts of the case on direct appeal:

> In 2014, Wing and his wife began caring for a three-year-old boy ["JHW"] because his young mother could not adequately care for him. Within three months of living with the Wings, the child died from physical abuse inflicted upon him by the Wings.
>
> On November 7, 2014, the State charged Wing with homicide by abuse, and in the alternative, first degree manslaughter, each with two aggravating factors: (1) the defendant used his position of trust or confidence to facilitate the commission of the crime, and (2) the defendant should have known the victim was particularly vulnerable or incapable of defense.
>
> Wing and the State entered into a "Proffer Agreement" in which the State agreed to dismiss with prejudice the homicide by abuse charge and the two aggravating factors, and charge Wing with first degree manslaughter—domestic violence and third degree assault of a child—domestic violence. As part of the agreement, Wing agreed to provide the State with truthful information about the child's abuse and death. The agreement permitted the State to "re-file the [sentencing] enhancements" if Wing failed two polygraph tests.[1] Clerk's Papers (CP) at 55. As part of his plea, Wing admitted that he recklessly caused the death of the child by failing to obtain medical care for injuries the child sustained while a member of Wing's household.

---

[1] The information did not include sentencing enhancements, but did include aggravating factors. [footnote by Court of Appeals]

1 | After Wing failed two polygraph tests, the State filed a motion to find Wing in violation of the agreement and to refile the abuse of trust and vulnerable victim
2 | aggravating factors. Wing agreed that he committed the aggravating factors.

3 | The superior court sentenced Wing to an exceptional sentence of 416 months.

4 Dkt. 2, Ex. 11 at pp. 2-3; *State v. Wing*, No. 48143-0-II, 2017 WL 888608 at *1 (February 28,

5 2017).

6 **II.    Procedural History**

7     A.  <u>Direct Appeal</u>

8     Petitioner filed a direct appeal with the state court of appeals, arguing: (1) the trial court

9 improperly characterized plaintiff's crimes as domestic violence despite Petitioner and JHW not

10 being family or household members; (2) his guilty plea was involuntary because his decision to

11 enter it was premised on the incorrect offender score; and (3) the prosecutor breached the plea

12 agreement. Dkt. 12, Ex. 7 at pp. 2-3. The state court of appeals reversed his conviction based on

13 the involuntariness of the guilty plea, but denied relief as to his other two grounds. *Id.*, Ex. 11 at

14 pp. 7-10. The court therefore remanded to the superior court with instructions to allow Petitioner

15 to withdraw his guilty plea. *Id.*, Ex. 7 at pp. 9-10. Petitioner filed a Motion for Reconsideration

16 (*Id.*, Ex. 12), which the state court of appeals denied (*Id.*, Ex. 13).

17     Petitioner then filed a Petition for Review with the Washington State Supreme Court

18 ("state supreme court"), arguing: (1) the state court of appeals erred in determining the trial court

19 correctly found domestic violence; and (2) the prosecutor breached the plea agreement, and

20 Petitioner is entitled to specific performance of that plea agreement. *Id.*, Ex. 14 at p. 2. That court

21 denied review without further comment. *Id.*, Ex. 15. The Court of Appeals issued its Mandate on

22 September 12, 2017. *Id.*, Ex. 16.

23

24

REPORT AND RECOMMENDATION - 3

On remand to superior court, both Petitioner and the State submitted Memoranda Regarding the Timeframe for Action, setting out their respective views on the pacing of Petitioner's remanded case. Dkt. 12, Exs. 28, 29. Petitioner requested one year from the Mandate to decide whether to withdraw his guilty plea (*Id.*, Ex. 29), but the State argued one year was excessive and that the trial court should set a "reasonable time limit" for Petitioner's decision (*Id.*, Ex. 28 at p. 6). The superior court agreed with the State and gave Petitioner until November 13, 2017, to decide whether to withdraw his guilty plea. *Id.*, Ex. 30. Petitioner filed a Motion for Discretionary Review and Motion to Stay with the state court of appeals, challenging the superior court's decision to give him a deadline. *Id.*, Exs. 32, 33. The state court of appeals granted the stay (*Id.*, Ex. 37), but denied review of the superior court's decision (*Id.*, Ex. 38). Petitioner filed a Motion to Modify and Extend Stay. *Id.*, Ex. 29. The state court of appeals granted the extension pending a decision from the state supreme court, but denied the Motion to Modify. *Id.*, Exs. 40, 42.

Finally, though not included in the state court record initially filed by Respondent, presumably because it was still pending, it appears Petitioner also filed a Motion for Discretionary Review with the state supreme court. *See* Dkt. 17-1. In Respondent's Response to Petitioner's Motion for Extension, he has included a copy of a Ruling Denying Review as to that issue. *Id.* Thus, the record before this court shows the state supreme court has terminated review and Petitioner has not decided whether or not to withdraw his guilty plea. *See* Dkt. 17 at pp. 3-4.

B.   Personal Restraint Petition

While his direct appeal was pending, Petitioner also file a Personal Restraint Petition ("PRP"), arguing that the superior court had violated his rights by monitoring and recording private conversations between him and his attorney. Dkt. 12, Ex. 17. However, the state court of

appeals noted that Petitioner had not yet determined whether he would withdraw his guilty plea, so placed a stay on the PRP pending Petitioner's decision on whether to withdraw his guilty plea. *Id.*, Ex. 22. Petitioner filed a Motion to Modify, requesting that the stay be terminated (*Id.*, Ex. 23), which the state court of appeals denied. *Id.*, Ex. 24.

Petitioner filed a Petition for Review with the state supreme court, asking it to lift the stay. *Id.*, Ex. 25. The state supreme court Deputy Clerk re-designated the Petition for Review as a Motion for Discretionary Review. *Id.*, Ex. 26. The record before this Court indicates Petitioner's PRP is still pending before the state supreme court. Dkt. 9 at p. 4.

C. Exhaustion of State Remedies

Respondent has affirmatively stated Petitioner has properly exhausted his state court remedies. Dkt. 9, p. 7. Regardless, even if Petitioner had failed to exhaust his state court remedies, the Court may proceed to the merits of an unexhausted habeas petition if the ultimate dismissal of a petition is a foregone conclusion. *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Thus, the Court may consider Petitioner's Petition regardless of anything pending before the state court. 28 U.S.C. § 2254(b)(2), (3).

STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that

reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (*quoting Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S.Ct. at 1398.

<p style="text-align:center">EVIDENTIARY HEARING</p>

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle

REPORT AND RECOMMENDATION - 6

the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 180. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see Cullen*, 563 U.S. at 186. The Court finds it is not necessary to hold an evidentiary hearing in this case because Petitioner's claims may be resolved on the existing state court record.

## DISCUSSION

Petitioner raises only one ground in his Petition: whether the prosecutor failed to comply with the plea agreement when he refiled two aggravating factors, rather than "enhancements" as stated in the Proffer Agreement.

"A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction." *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). Thus, "[w]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). If the State breaches such a contract, it is within the state court's discretion to determine "whether the circumstances of the case require specific performance or an opportunity to withdraw the plea." *Fox v. Johnson*, 832 F.3d 978, 988 (9th Cir. 2016) (citing *Santobello*, 404 U.S. at 263).

"[P]lea agreements are contractual in nature," and so the Court interprets them "by contract law standards." *United States v. Clark*, 218 F.3d 1092, 1095 (9th Cir. 2000) (quoting *United States v. De la Fuente*, 8 F. 3d 1333, 1337 (9th Cir. 1993)). Courts proceed in three steps

when construing a plea agreement. *United States v. Plascencia-Orozco*, 852 F.3d 910, 919 (9th Cir. 2017). First, the Court asks "whether 'the terms of the plea agreement on their face have a clear and unambiguous meaning.'" *Id*. (quoting *Clark*, 218 F.3d at 1095). If so, the Court looks no further. However, if the terms are ambiguous, the Court moves to the second step and considers "'the facts of the case to determine what the parties reasonably understood to be the terms of the agreement." *Id*. (quoting *Clark*, 218 F.3d at 1095). If ambiguities remain, the Court moves to the third step and construes the ambiguities against the government and in favor of the defendant. *Id*.

In determining the prosecutor did not violate the Proffer Agreement, the state court of appeals stated:

> . . . [T]he evidence shows that the intent of the parties was to allow the State to refile the aggravating factors that it had filed in the original charging information.
>
> . . .
>
> [T]he Proffer Agreement repeatedly references the State's authority to "*re-file*" the "enhancements." This logically refers to the original charging information from which the plea bargain was formed. The original charging information included both the abuse of trust and vulnerable victim aggravators, but no sentencing enhancements. The language of the Proffer Agreement, read in the context of the first information, the second amended information, and the supplemental to amended information, clearly refers to the abuse of trust and vulnerable victim aggravating factors, which were originally charged then dropped in concert with the plea agreement, with the potential to be refiled should Wing fail two polygraph tests.
>
> It is also worth noting that the Proffer Agreement expressly states that if Wing violated the agreement and the State added the "enhancements," the State was free to pursue any amount of confinement up to life in prison. CP at 55. Had the parties intended to strictly limit the State to adding "sentencing enhancements" in the event that Wing failed to uphold his side of the plea agreement, there would be no legally sound way for the State to seek a sentence of life in prison because a true sentencing enhancement has a determinate additional amount of time for a violation. RCW 9.94A.533. Rather, the only possible way for Wing to receive a sentence of life in prison would be if aggravating factors were charged and pleaded. RCW 9.94A.535; RCW 9.94A.537.

This interpretation is further supported by Wing's comments during the plea colloquy with the superior court. There, Wing explained to the superior court:

> [W]e are prepared at this time to enter a plea of guilty to the new amended information through which the state will be dismissing the homicide by abuse. *They'll also be dismissing the enhancements, subject to refiling* on the enhancements only, related to a proffer agreement that was signed by both sides this day.

Verbatim Record of Proceedings (VRP) (March 19, 2015) at 3 (emphasis added).

At the same hearing, the State explained the essence of the plea agreement to the court:

> [O]bviously Mr. Wing is in a position where he's going to get some benefit to this plea, but by agreement if he does not hold up his end, what he is supposed to do, the state has the option under certain conditions to add the *enhancements or aggravators* back into this charge, which he will stipulate to with regard to facts, and then we will proceed to sentencing under those charges.

VRP (March 19, 2015) at 3-4. The superior court confirmed with Wing's counsel, "Is that accurate, [Wing's counsel]?" To which Wing's counsel responded, "That is correct, Your Honor, with the understanding that it's just enhancements related to Count I and II that are in the amended information and not the original Count I, homicide by abuse, which is forever dismissed by today's actions." VRP (March 19, 2015) at 4. Viewed in context, the word "enhancements" as used in the Proffer Agreement was not intended to limit the State to "sentencing enhancements" under RCW 9.94A.533, but rather referred to the aggravating factors which were a critical part of the plea deal.

Wing's comments to the superior court when the State moved to add the aggravating factors to the amended information further evidences his understanding that the terms of the plea agreement permitted such action. Initially, Wing's counsel opposed the addition of the aggravators by arguing that Wing had not failed two licensed polygraph tests as required by the plea agreement. However, Wing then asked his counsel to concede that dispute, and expressed his desire to stipulate to the aggravating factors. Wing explained himself to the superior court, saying, "[M]y point is all these polygraphs and everything were the intent to try and get an aggravator." VRP (Sept. 25, 2015) at 19. Wing then proceeded to stipulate to both aggravating factors. At no point in the colloquy did Wing or his counsel express any surprise or confusion as to why or how the aggravators were being added, suggesting that Wing understood the State's actions to be consistent with their previously negotiated plea agreement.

> For these reasons we hold that the State did not breach the terms of the plea agreement.

Dkt. 12, Ex. 11 at pp. 4-7; *Wing*, 2017 WL 888608 at *2-*3.

Here, Petitioner argues the State breached his plea agreement when the prosecutor refiled aggravators, rather than enhancements, and that he is entitled to specific performance of the plea agreement. At the time the Proffer Agreement was made, Petitioner had been charged with homicide by abuse and manslaughter in the first degree, both with position of trust and particularly vulnerable victim aggravators. Dkt. 12, Ex. 4 at pp. 1-2. The Proffer Agreement provided that, "[i]n exchange for information provided and verified pursuant to [this agreement]," Petitioner would be allowed to plead guilty to "Manslaughter in the 1st Degree (Domestic Violence) and Assault of a Child in the 3rd Degree (Domestic Violence), each charge with no enhancements." *Id*., Ex. 5 at 190. However, if the State could prove Petitioner lied, or if Petitioner failed two polygraph tests, "the State shall be entitled to re-file the Manslaughter in the 1st degree enhancements . . . ." *Id*. The Proffer Agreement reiterated that, if Petitioner lied, "the State may re-file, without objection, the enhancements as to the Manslaughter 1 – DV and Assault Child 3 – DV cases . . . ." *Id*.

First, the Court determines whether the language of the plea agreement is ambiguous. Here, the state court of appeals did not explicitly engage in the first step of analysis and find that the term "enhancement" was ambiguous. However, the state court appeals implied the term "enhancement" was ambiguous because it found the term as applied in the context of the state court proceedings was intended to mean more than just a sentencing enhancement. In particular, the state court records show the State could not "re-file" enhancements because it had filed aggravators, not enhancements, in its initial information. Dkt. 12, Ex. 4 at p.1. The state court of appeals thus determined "enhancement" could not mean only a sentencing enhancement, since

1  no sentencing enhancement had been filed in the first place. Though the state court of appeals
2  did not make an explicit finding that the term "enhancement" was ambiguous, it nonetheless
3  reasonably determined that "enhancement," in the context of the rest of the contract, was not
4  clear on its face. *Id.*, Ex. 11 at p. 6.

5      Here, having concluded the term "enhancement" was ambiguous, the state court of
6  appeals moved to the second step and reviewed the facts surrounding the Proffer Agreement to
7  determine what the parties reasonably understood to be the terms of the Proffer Agreement. *See*
8  *Buckley v. Terhune*, 441 F.3d 688, 697-98 (9th Cir. 2006) (a plea agreement that stated defendant
9  "could be sentenced to state prison for a maximum term of 15 years . . . and a maximum parole
10 period of life," but subsequently stated the maximum term would be 15 years, was ambiguous,
11 and the Court could proceed to examine extrinsic evidence); *see also United States v. Williams*,
12 18 Fed. App'x 637, 642 (9th Cir. 2001) ("To the extent the language [of a plea agreement] is
13 ambiguous, the court can look to extrinsic evidence.").

14      In analyzing the understanding of the parties, the state court of appeals concluded it is
15 clear the agreement was designed to allow the State to refile the aggravators which it had
16 originally filed against Petitioner. In reaching this conclusion, the state court of appeals notes
17 that when Petitioner entered his guilty plea, his counsel explained his understanding of the
18 Proffer Agreement:

19      [W]e are prepared at this time to enter a plea of guilty to the new amended information through which the state will be dismissing the homicide by abuse.
20      They'll also be *dismissing* the enhancements, subject to *refiling* on the enhancements only, related to a proffer agreement that was signed by both sides
21      this day.

22 Dkt. 12, Ex. 2 at p. 3 (emphasis added). The prosecutor also stated:

23      [J]ust so the court is aware, . . . Mr. Wing is in a position where he's going to get some benefit to this plea, but by agreement if he does not hold up his end, what he
24

REPORT AND RECOMMENDATION - 11

> is supposed to do, the state has the option under certain conditions to add the *enhancements or aggravators* back into this charge, which he will stipulate to with regard to facts, and then we will proceed to sentencing under those charges.

*Id*. at pp. 3-4 (emphasis added).

After Petitioner failed two polygraph tests, the prosecutor filed a "Supplemental [sic] to Amended Information Adding Aggravating Factors" (*Id*., Ex. 4 at 20), which requested that the aggravating factors be added back to the charge. Notably, Petitioner filed a Response, arguing that the State "has failed to meet their preponderance of the evidence burden necessary *to re-file the aggravators*." *Id*., Ex. 5 at p. 50 (emphasis added). The fact Petitioner's counsel used the term "aggravator" is particularly persuasive in affirming Petitioner understood the Proffer Agreement was referring to "aggravators" even though the term "enhancement" was used. Further, Petitioner stipulated to the failure of two polygraph tests and stipulated to the aggravating factors entered by the prosecutor. *Id*., Ex. 2 at pp. 19-21. Petitioner even stated the purpose behind the polygraphs was "to try and *get an aggravator* to state that [JHW] was vulnerable." *Id*. at p. 19. As the state court of appeals noted, neither Petitioner nor his counsel expressed confusion as to why the aggravators, rather than enhancements, were being entered against Petitioner.

Having reviewed the Proffer Agreement itself, the transcript from Petitioner's plea hearing, and the briefing and other filings presented at that hearing, the Court determines the state court of appeals reasonably concluded that, though the agreement used the term "enhancements," it was clearly intended to reference the aggravators that the prosecutor originally filed in Petitioner's case. Thus, because the circumstances surrounding the Proffer Agreement indicate it was intended to allow the State to file aggravators against Petitioner if he

failed two polygraph examinations, the state court of appeals reasonably determined the prosecutor had not breached the Proffer Agreement when he refiled the aggravators.

If the state court of appeals had found at the second step that the ambiguity between "aggravators" and "enhancements" was not resolved by reference to the extrinsic evidence, the state would have been required to construe any remaining ambiguities against the State. *Plascencia-Orozco*, 852 F.3d at 919. However, since all ambiguities have been resolved at the second step, the state court of appeals reasonably stopped its analysis and was not required to proceed further. *Plascencia-Orozco*, 852 F.3d at 919. Thus, the state court of appeals' determination that Petitioner intended to allow the State to refile the aggravators, rather than sentencing enhancements, was not contrary to, or an unreasonable application of, clearly established federal law.

Therefore, the Court recommends Petitioner's Petition be denied.

## CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Petition should proceed further.

1 Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect
2 to this Petition.

## CONCLUSION

The Court finds the state court's adjudication of the sole ground raised in the Petition was not contrary to, or involved an unreasonable application of, clearly established federal law. Therefore, the Court recommends Petitioner's Petition be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on July 13, 2018, as noted in the caption.

Dated this 28th day of June, 2018.

/s/ David W. Christel
David W. Christel
United States Magistrate Judge